# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

ROLLS-ROYCE NORTH AMERICAN          )
TECHNOLOGIES INC,                   )
                                    )
      Plaintiff,                    )
                                    )
      v.                            )     Case No. 1:19-cv-04302-TWP-TAB
                                    )
DYNETICS, INC.,                     )
                                    )
      Defendant.                    )

## ENTRY ON PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF

This matter is before the Court on Plaintiff Rolls-Royce North American Technologies, Inc.'s ("Rolls-Royce") Petition for Temporary Restraining Order and Preliminary Injunction. (Filing No. 11.) Rolls-Royce is the subcontractor to Defendant Dynetics, Inc. ("Dynetics"), which is currently fulfilling a contract with the United States Army to develop a vehicle-based high-energy laser. As part of a Contractor Teaming Agreement ("Teaming Agreement"), Rolls-Royce and Dynetics agreed to deal exclusively with one another when completing the power and thermal energy portion of the government contract. The parties worked together exclusively through multiple phases of the government contract, but in September 2019, Dynetics informed Rolls-Royce that Rolls-Royce had breached the contract, and as a result Dynetics would no longer observe the exclusivity provision. Hoping to maintain the status quo through an arbitration process required by the Teaming Agreement, Rolls-Royce petitioned this Court for a temporary restraining order and preliminary injunction.

Rolls-Royce asks the Court, among other things, to enjoin Dynetics from terminating the Teaming Agreement and from sharing any of Rolls-Royce's confidential trade secrets with other entities. Because the standard for a temporary restraining order is essentially identical and because

Dynetics has had a full opportunity to respond, the Court treats Rolls-Royce's Motion as one for a preliminary injunction. For the following reasons, the Court **grants in part and denies in part** Rolls-Royce's Motion for Temporary Restraining Order and Preliminary Injunction.

## I.     LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right. In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

> To obtain a preliminary injunction, a party must establish [1] that it is likely to succeed on the merits, [2] that it is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in its favor, and [4] that issuing an injunction is in the public interest.

*Grace Schools v. Burwell*, 801 F.3d 788, 795 (7th Cir. 2015); *See Winter*, 555 U.S. at 20. "The court weighs the balance of potential harms on a 'sliding scale' against the movant's likelihood of success: the more likely he is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the more it must weigh in his favor." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015). "The sliding scale approach is not mathematical in nature, rather it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 678 (7th Cir. 2012) (citations and internal quotation marks omitted). "Stated another way, the district court 'sit[s] as would a chancellor in equity' and weighs all the factors, 'seeking at all times to minimize the costs of being mistaken.'" *Id.* (quoting *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992)).

## II.     BACKGROUND

**A.     The Parties**

Plaintiff Rolls-Royce is a corporation organized under the laws of the State of Delaware with its principal offices in Indianapolis, Indiana. Rolls-Royce builds aircraft engines and other machinery. In addition to providing goods to private sector consumers, Rolls-Royce provides its goods, services, and expertise to the U.S. Government pursuant to government contracts and subcontracts, often with branches of the military. LibertyWorks, also based in Indianapolis, is a wholly-owned Rolls-Royce subsidiary that performs a number of these government contracts, particularly those focused on developing advanced technology for propulsion and power often involving classified data and programs important to U.S. national security. LibertyWorks frequently partners with other businesses to provide comprehensive research and development services to the United States military.

Defendant Dynetics is an applied sciences and information technology company headquartered in Huntsville, Alabama. Its primary customers are the United States Department of Defense, U.S. intelligence agencies, and the National Aeronautics and Space Administration.

**B.     The Army's HEL-TVD Program, the Prime Contract, and the Teaming Agreement**

In 2017, the United States Army (the "Army") released a Request for Proposals ("RFP") for development of a High Energy Laser Tactical Vehicle Demonstrator ("HEL-TVD"). Dynetics entered into a Prime Contract with the Army for the development of the HEL-TVD program. The Prime Contract is a Cost-Reimbursement type contract, and was divided into a base period and three options. (Filing No. 57-54 at 8-9.)   As the prime contractor, Dynetics is required to analyze all subcontractor costs to assess reasonableness and not exceed the budget ceiling of the Prime Contract. *See* 48 C.F.R. 15.404-3.

Prior to the award of the Prime Contract, on April 21, 2017, LibertyWorks and Dynetics entered into a Contractor Teaming Agreement ("Teaming Agreement"), pursuant to which Dynetics would submit a proposal to the Army as the prime contractor, and LibertyWorks would serve as the exclusive subcontractor for the power and thermal energy portion of the HEL-TVD Program. (*See* Filing No. 57-1.) The Teaming Agreement is valid "through the period of the contract should the Prime win award of the Contract" from the Army. *Id*. at 5.

The Teaming Agreement's exclusivity provision provides as follows:

> Dynetics agrees that where Subcontractor can meet: (1) pricing targets established by [Dynetics]; (2) schedule requirements; and (3) technical capabilities, Subcontractor shall be Dynetics' exclusive source for the scope listed in Exhibit A Section 6 (Power and Thermal Management) and shall not pursue or use other proposals for this scope (Power and Thermal Management) of the Contract during the term of this Agreement subject [sic] the exceptions noted above.

*Id.* The Teaming Agreement is governed by Alabama law. *Id.* at 8. It also provides for a dispute resolution process that culminates in binding arbitration enforceable under the Federal Arbitration Act, conducted pursuant the rules of the American Arbitration Association. *Id.* Amongst other triggering events, the Teaming Agreement shall be terminated if the Parties are unable "after good faith negotiation to reach agreement on the price and terms and conditions of the subcontract within ninety (90) days from award of the prime contract . . . to Dynetics." *Id.* at 6.

## C.      Team Dynetics Selected as the Exclusive Contractor and the Subcontract

The Army awarded contracts to five teams, including Team Dynetics, to begin developing separate HEL-TVD efforts under the Base Contract period. (Filing No. 61-39 at 7-17.) Team Dynetics included Dynetics, LibertyWorks, and Lockheed Martin. *Id.* at 20. At each phase (or Option) of the Program, the Army "downselected" the teams that would move on in the competition. Team Dynetics was downselected to Option 1 and Option 2. *Id.* at 17-20. On

February 5, 2019, Team Dynetics was the only team downselected to perform Option 3. *Id.* at 20-21.

On July 2, 2018, after award of the Prime Contract, Dynetics issued a Subcontract (the "Subcontract") to LibertyWorks for Option 2 of the Prime Contract, which is known as the Preliminary Design Review phase. (Filing No. 57-2.) For Option 3 (the Critical Design Review phase), LibertyWorks submitted a proposal to Dynetics to negotiate price, technical, and schedule.

D.     **LibertyWorks' Performance under the Subcontract**

In May 2017, Dynetics provided LibertyWorks with its pricing targets for Option 3. LibertyWorks and Dynetics negotiated a total price of $15,016,342.00 for the thermal and power work for Option 3. In early 2018, Dynetics decided that a Two Phase Pump Loop cooling technology would be used in the HEL-TVD system design instead of the turbine-based solution initially included in LibertyWorks' proposal. (Filing No. 57-3 at 8.) LibertyWorks submitted a revised proposal in September 2018, raising its price to $17.4 million. LibertyWorks refused to meet Dynetics' proposed pricing targets for the design solution. (Filing No. 57-41.)

On January 31, 2019, after completion of the Preliminary Design Review, Dynetics received the contract award from the Government for Option 3. On February 8, 2019, Dynetics again requested a revised proposal from LibertyWorks for Option 3 work. LibertyWorks submitted a revised proposal on March 13, 2019 for $20.2 million. (Filing No. 57-6; Filing No. 57-42.) Dynetics found this proposal was lacking in basic cost substantiation information, and thus could not evaluate LibertyWorks' March 13, 2019 proposal. LibertyWorks was also exceeding the funding authorized by Dynetics for work in advance of definitizing a modification to the Subcontract. As a result, Dynetics issued a stop work order until the Parties could reach an agreement on price. (Filing No. 57-44.) The stop work order noted that "Dynetics was unable to

evaluate the submitted proposal due to lack of pricing details" and included a request for LibertyWorks to provide those details. *Id.* LibertyWorks complied.

After further negotiations, on April 25, 2019, LibertyWorks offered to lower its price to approximately $13.4 million for work to be performed by LibertyWorks and $1.5 million of material to be purchased by Dynetics. (Filing No. 1-2 at 25-27.) Dynetics accepted that offer. (Filing No. 61-39 at 110-11.) The agreement was confirmed in multiple written communications. (Filing No. 61-10 at 2; Filing No. 61-22; Filing No. 61-24.) LibertyWorks subsequently sent Dynetics a Basis of Estimate on May 17, 2019, that broke down its price line-by-line. (Filing No. 61-34.)

**E.     Dynetics' Solicitation of Other Subcontractors**

During Option 2 and Option 3 of the Prime Contract, Dynetics was losing patience with LibertyWorks. In September 2018, while the Parties were still working under Option 2, Dynetics personnel began floating the idea in internal emails of replacing LibertyWorks if Team Dynetics was selected as the sole contractor to perform Option 3. (Filing No. 61-1.) In late March, after Team Dynetics was chosen as the sole contractor for Option 3, unbeknownst to LibertyWorks, Dynetics sought proposals from two of LibertyWorks's competitors for the power and thermal management portion of the Program. (Filing No. 61-2; Filing No. 61-3.) On March 29 and 30, 2019, the competitors responded to Dynetics' proposal requests and both competitors expressly used the title "Proposals" on their responses. (Filing No. 61-4; Filing No. 61-5.) Dynetics also referenced the documents as "Proposals" in its follow-up communications. (Filing No. 61-8; Filing No. 61-9.) Dynetics falsely denied reaching out to any other vendors in a call with LibertyWorks on October 7, 2019. (Filing No. 61-10 at 3.) Dynetics was positioning and pursuing at least two of LibertyWorks' competitors as "backups" for the HEL-TVD Program while the

Teaming Agreement and exclusivity requirements with LibertyWorks were in place. (Filing No. 61-39 at 78, 84.)

The Teaming Agreement provides that "[e]ach Party shall own all right, title and interest in any Intellectual Property if developed, authored, conceived or reduced to practice by that Party during the performance of this Agreement." (Filing No. 57-1 at 6 ¶9.) With the competitor proposals in hand, again unbeknownst to LibertyWorks, Dynetics scrubbed LibertyWorks' name and other insignia from the proposal documents. (Filing No. 61-6.) The purpose of removing LibertyWorks' name and insignia from the documents was to send them "to another vendor who might be able to do the same scope of work" as LibertyWorks. (Filing No. 61-39 at 88.) Dynetics did not, however, remove LibertyWorks' proprietary information from these documents. (Filing No. 61-6; Filing No. 61-10 at 3; Filing No. 61-30; Filing No. 61-31.) At least one of the scrubbed documents was prepared by LibertyWorks. None of these documents were sent to LibertyWorks' competitors, but Dynetics was prepared to send this information out in an RFP after successfully terminating exclusivity. (Filing No. 61-39 at 88-90.)

**F.    Termination of Exclusivity**

On September 17, 2019, LibertyWorks was caught off-guard when it received a letter from Dynetics informing "… Rolls-Royce that it had not met the requirements to qualify for continued exclusivity for Power and Thermal Management work under Section 6 Exclusivity of the … Teaming Agreement." (Filing No. 1-1 at 101.) Among the reasons Dynetics cited as the basis for this conclusion were LibertyWorks' inability to come to a price agreement with Dynetics, the lack of information LibertyWorks provided to substantiate its costs, and LibertyWorks' decision to deny Dynetics access to review project specifics. *Id.*

On September 26, 2019, LibertyWorks responded to Dynetics' letter by stating its disagreement with the claim that it had not met the requirements to maintain exclusivity. (Filing No. 1-2 at 31.) In that letter, LibertyWorks expressly invoked the dispute resolution procedure detailed in Section 10.10 of the Teaming Agreement. *Id.* Section 10.10 states

> Any dispute, controversy or disagreement arising out of, relating to or resulting from this Agreement which is not disposed of by mutual agreement within a period of ten (10) days after one party has provided written notice of the dispute to the other, shall be subject to Executive Level review by Dynetics and Subcontractor. If this review process is not successful within a reasonable period of time (normally 15-30 days, unless extended by agreement of the Parties), then the matter shall be designated as a dispute and shall be submitted to and settled by final and binding arbitration ….

(Filing No. 57-1 at 8.) On September 30, 2019, Dynetics sent a letter to LibertyWorks acknowledging receipt of the September 26, 2019 letter and purporting to begin "scheduling the executive management meeting as required under Section 10.10 of the Teaming Agreement." (Filing No. 1-2 at 36.)

The parties held a telephone call on October 7, 2019. Later that day, Dynetics sent a letter to LibertyWorks stating that "[t]he Parties discussed and could not reach an agreement. Dynetics considers the Executive Level Review process complete with the Parties unable to reach an agreement. Consequently, Dynetics shall enforce its determination that LibertyWorks no longer qualifies for exclusivity under the Teaming Agreement." (Filing No. 1-2 at 38.) LibertyWorks responded on October 10, 2019, stating that it did not consider the single telephone call to constitute a full executive level review under the Teaming Agreement. (Filing No. 1-2 at 40.) The October 10, 2019 letter also stated LibertyWorks' position that the Teaming Agreement required Dynetics to engage in arbitration before terminating exclusivity. *Id.* Dynetics responded on October 15, 2019, officially terminating exclusivity and indicating it did not intend to wait until

the resolution of arbitration to do so.  (Filing No. 1-2 at 44.)  LibertyWorks filed an arbitration demand disputing the termination on October 20, 2019.  (Filing No. 1-2 at 47.)

## G.  **Procedural History**

Also on October 20, 2019, LibertyWorks filed a complaint for injunctive relief and damages in Marion Superior Court.  (Filing No. 1-2.)  Dynetics removed the action to this Court on October 22, 2019.  (Filing No. 1.)  On October 23, 2019, LibertyWorks filed the instant motion for temporary restraining order and preliminary injunction, asking the Court to enjoin Dynetics from (1) terminating the Teaming Agreement, (2) treating the exclusivity provision of the Teaming Agreement as of no effect, (3) negotiating with any other entities regarding the work to be exclusively performed by LibertyWorks under the Teaming Agreement, and (4) sharing any of LibertyWorks' confidential and/or proprietary trade secrets with any other entities.  (Filing No. 11.)  Both parties briefed the Court and designated evidence on the Motion for Preliminary Injunction.  On December 4, 2019 the Court held a hearing on the motion.[1]

## III.  **DISCUSSION**

The Court will first address Dynetics' threshold argument that any dispute between the Parties must be resolved by arbitration rather than litigation, then turn to the preliminary injunction factors.  By provision of the Teaming Agreement, the Court applies substantive Alabama law.  (Filing No. 57-1 at 9.)

## H.  **Jurisdiction to Issue a Preliminary Injunction**

Dynetics contends that any dispute between the Parties must be resolved through arbitration, rather than litigation.  (Filing No. 57 at 37.)  The dispute resolution clause in the

---

[1] No evidence was admitted at that hearing. Thus, throughout this Order the Court cites the designated evidence by docket number. If either party referenced any document at that hearing that does not appear on the docket, the Court only considered it as demonstrative.

Teaming Agreement requires that "[a]ny dispute, controversy or disagreement arising out of, relating to or resulting from" the Teaming Agreement "shall be submitted to and settled by final and binding arbitration." (Filing No. 57-1 at 9.) Alabama courts strive to interpret contracts according to their clear and plain meaning and presume that the Parties intended to do what the terms of the agreement clearly state. *The Dunes of GP, L.L.C. v. Bradford*, 966 So. 2d 924, 927 (Ala. 2007) (internal quotation omitted). The Teaming Agreement's arbitration provision is mandatory. (Filing No. 57-1 at 9.) Dynetics points out that nothing in the Teaming Agreement requires arbitration as a precursor to termination. (Filing No. 57 at 38-40.)

The courts in Alabama have settled the question of whether a court can issue injunctive relief in a case subject to arbitration. Alabama courts have explained that the "majority of federal courts … have concluded that in limited situations a binding arbitration clause does not bar a plaintiff from seeking emergency injunctive relief or other provisional remedies in court." *Drago v. Holiday Isle, L.L.C.*, 537 F. Supp. 2d 1219, 1221 (S.D. Ala. 2007) (citations omitted), *see also Spinks v. Automation Pers. Servs., Inc.*, 49 So. 3d 186, 188 (Ala. 2010). Following the Fourth Circuit, Alabama has determined these "limited situations" to be ones "where an arbitral award could not return the parties substantially to the status quo." *Drago* at 1222. "The analysis of whether an arbitral award could return the parties substantially to the status quo would appear to be identical or at least very similar to the analysis of irreparable harm …." *Id.* This rule holds even where "the arbitration clause … does not reserve to the trial court any jurisdiction for temporary or preliminary equitable relief." *Holiday Isle, LLC v. Adkins*, 12 So.3d 1173, 1176 (Ala. 2008). As for the duration of these injunctions, *Spinks* concluded that the court's jurisdiction allowed for "a preliminary injunction to preserve the status quo pending completion of the arbitration proceeding," precisely the same duration Rolls-Royce asks for here. *Spinks* at 190.

Dynetics' threshold argument fails to acknowledge Alabama's conclusive caselaw on this issue, opting instead to rely on broader cases that stand for the enforcement of unambiguous contractual language. (Filing No. 57 at 37-38.) Dynetics also argues that because it is a government contractor, forcing it to maintain the status quo despite looming government deadlines is inconsistent with the spirit of the Teaming Agreement. However, it cites no Alabama caselaw to support its statement that the rule announced by the Alabama Supreme Court in *Spinks* does not apply to federal government contractors. Dynetics has failed to present relevant authority on this issue. The Court is not persuaded by Dynetics' assertion that it is without jurisdiction to enter an injunction here. Under Alabama law, a court may issue an injunction if an arbitral award would be insufficient to substantially return the parties to the status quo ante. As that inquiry is similar if not identical to an irreparable harm inquiry, the Court addresses it below.

## I.  **Preliminary Injunction Factors**

To obtain a preliminary injunction, Rolls-Royce must establish the following four factors: (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that issuing an injunction is in the public interest. *Planned Parenthood of Ind. And Ky., Inc. v. Comm'r*, 194 F.Supp.3d 818, 825-26 (S.D. Ind. 2016). The first two factors are threshold determinations: "[i]f the moving party meets these threshold requirements, the district court 'must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied." *Stuller, Inc. v. Steak N Shake Enter., Inc.*, 695 F.3d 676 (7th Cir. 2012) (quoting *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001)). Because this case involves an arbitration clause, under

Alabama law, resolution of the irreparable harm factor also determines whether the Court has jurisdiction to issue an injunction.  *Drago* at 1222.

1.    **Likelihood of Success on the Merits**

Each party argues that the other breached the Teaming Agreement.  Rolls-Royce argues Dynetics breached the exclusivity clause of the Teaming Agreement when it pursued proposals from Rolls-Royce's competitors for Option 3 of the Prime Contract.  ([Filing No. 12 at 17.](#)) Dynetics argues that Rolls-Royce breached the agreement by failing to meet its technical, schedule, and pricing targets.  ([Filing No. 57 at 42.](#))  Dynetics also contends that contrary to Rolls-Royce's assertion, the parties did not reach an agreement as to price and terms of an Option 3 contract within 90 days of the award of the Prime Contract.  *Id.*

"The elements of a breach-of-contract claim under Alabama law are (1) a valid contract binding the parties; (2) the plaintiffs' performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages." *Shaffer v. Regions Financial Corp.*, 29 So.3d 872, 880 (Ala. 2009) (internal quotation omitted).  Prongs (1) and (4) are not in dispute. The remaining prongs are in dispute as Dynetics argues Rolls-Royce failed to perform under the contract and that it met its own obligations under the contract.

a)    **Dynetics' Nonperformance**

Rolls-Royce has submitted evidence to support its contention that it has a better than negligible chance of succeeding on the merits, based on Dynetics unilateral termination of exclusivity.  See *Meridian Mut. Ins. Co. v. Meridian Ins. Grp., Inc.*, 128 F.3d 1111, 1114 (7th Cir. 1997) (in the preliminary injunction context, a "likelihood of success" exists if the party seeking injunctive relief shows that it has a "better than negligible" chance of succeeding on the merits). The exclusivity provision of the Teaming Agreement provides that

where Subcontractor can meet: (1) pricing targets established by Prime; (2) schedule requirements; and (3) technical capabilities, Subcontractor shall be Dynetics' exclusive source for the scope listed in Exhibit A Section 6 (Power and Thermal Management) and shall not pursue or use other proposals for this scope (Power and Thermal Management) of the Contract during the term of this Agreement subject to the exceptions noted above.

(Filing No. 57-1 at 5.)  The evidence in the record establishes a timeline for Dynetics' breach of this provision.  On September 26, 2018, before Team Dynetics had been selected as the only team to move on to Option 3, Dynetics' personnel began musing about the idea of replacing Rolls-Royce.  (Filing No. 61-1.)  On March 22 and 25, 2019, after Team Dynetics had won the Option 3 phase but before it had negotiated a final price point for Option 3 with Rolls-Royce, Dynetics staff reached out to two of Rolls-Royce's competitors with a "statement of work."[2]  (Filing No. 61-2; Filing No. 61-3).  Both competitors responded in late March by sending "Proposals" to Dynetics.[3]  (Filing No. 61-4; Filing No. 61-5.)

In April 2019, Dynetics began to scrub documents prepared by Rolls-Royce in preparation for providing those documents to other potential subcontractors.  (Filing No. 61-6; Filing No. 61-30; Filing No. 61-31.)  Dynetics then offered Rolls-Royce a $6.43 million contract for Option 3.  (Filing No. 61-17.)  Rolls-Royce countered with an offer of "approximately $13.4 million" plus $1.5 million in hardware purchases.[4]  (Filing No. 61-20.)  On April 26, 2019, Dynetics "agreed to" this offer but did not formally accept it.  (Filing No. 61-39 at 140.)  That same day, Dynetics' Subcontracts Administrator Rachel Cope e-mailed Rolls-Royce personnel to thank him for his team's effort working "to come to a resolution on Option Year 3" and to inform him that Dynetics

---

[2] Mike Marcel ("Marcel"), Dynetics' Corporate Designee characterized these communications as a "request for work," (Filing No. 61-39 at 69) but the e-mails themselves purport to enclose a "statement of work."

[3] Marcel quibbled with these semantics as well, stating in his deposition that the documents submitted by Rolls-Royce's competitors were cost estimates despite their self-identification as proposals. (Filing No. 61-39 at 72.)

[4] On May 31, 2019, Rolls-Royce revised this figure upward by $52,000 for a total budget of $13.452 million. (Filing No. 57-50.)

was providing incremental funding for Option 3 in the amount of $250,000.00. ([Filing No. 61-22](#).) Additional communications between and among the parties indicate an agreement was reached on Option 3. ([Filing No. 61-24](#); [Filing No. 61-28](#).) The evidence supports Rolls-Royce's assertion that because the Parties proceeded into Option 3, the documents that Dynetics had scrubbed of Rolls-Royce's watermark were never sent to other potential subcontractors.

The evidence in the record also supports Rolls-Royce's contention that Dynetics breached the exclusivity provision of the Teaming Agreement when it sent Statements of Work to other potential subcontractors and received proposals from those companies in late March 2019. These statements of work constitute a pursuit of other proposals for the Power and Thermal Management portion of the Contract, solicited in violation of the Teaming Agreement's exclusivity provision. This evidence supports a better than negligible likelihood of success on the merits because Dynetics clearly pursued other proposals for the Power and Thermal Management scope of the Contract and failed to perform according to the contract when it breached exclusivity.

### b) Rolls-Royce's Performance under the Contract

Dynetics argues that Rolls-Royce's "own poor performance justified Dynetics' termination of the exclusivity provision." ([Filing No. 57 at 38](#).) It asserts that Rolls-Royce failed to "perform under the contract within price, schedule, and technical requirements as far back as March 2019." *Id.* More importantly, Dynetics argues that "the parties had not reached an agreement as to price and terms and conditions of an Option 3 contract within 90 days of Dynetics' prime contract award at the end of January." *Id.* According to Dynetics, this failure to reach an agreement justified termination of exclusivity under Section 8(g) of the Teaming Agreement, which triggers termination upon the "[i]nability of Dynetics and Subcontractor after good faith negotiation to

reach agreement on the price and terms and conditions of the subcontract within ninety (90) days from the award of the prime contract for the Contract to Dynetics." (Filing No. 57-1 at 5-6.)

The difficulty with this argument is its lack of support in the record. Rolls-Royce has presented evidence that Dynetics was not negotiating in good faith to reach an agreement on price and terms for Option 3. Dynetics' offer of $6.43 million is very low compared to the $14.9 million it ultimately agreed to. In light of internal communications indicating Dynetics was considering replacing Rolls-Royce with a different subcontractor, the Court is inclined to accept Rolls-Royce's assertion that Dynetics hoped it would be so discouraged by the low offer that Rolls-Royce would walk away from the negotiations.

Second, the Parties did come to an agreement within ninety days of the award of the Option 3 contract—on April 26, 2019.[5] The Parties agreed to a price of approximately $13.4 million plus $1.5 million in hardware that Dynetics committed to providing, and Dynetics approved an incremental payment of $250,000.00 so that Rolls-Royce could continue its work. Dynetics' argument that the agreement was not finalized until May 21, 2019 when Rolls-Royce submitted a "completely revised price proposal" that was roughly $52,000.00 higher that the agreed-upon $13.4 million, is not persuasive. Rolls-Royce's initial price proposal was for "approximately $13.4M," and the additional $52,000.00 added later that month represents an increase of just .4% of that number. (Filing No. 61-20.) Moreover, after receiving this revision, Dynetics continued to work with Rolls-Royce for four months before announcing that it terminated exclusivity in September 2019. Dynetics' continued performance under the contract does not support its argument that termination was triggered on May 21, 2019 when Rolls-Royce submitted its revised estimate.

---

[5] Team Dynetics won the primary contract for Option 3 on January 31, 2019, making the ninety-day deadline for reaching an agreement May 1, 2019.

Dynetics' arguments that Rolls-Royce failed to meet scheduling and technical requirements are not supported by the evidence. As Rolls-Royce points out, there is no evidence that the Army was dissatisfied with Rolls-Royce's schedules or technical proficiency because it awarded Team Dynetics the sole prime contract on Option 3 over four competing teams. In addition, Dynetics does not recall ever communicating to the Army that LibertyWorks had failed to meet the exclusivity requirements and concedes that LibertyWorks "did a fair job at the PDR presentation." (Filing No. 61-39 at pp. 43-44.)

When viewed as a whole, the evidence paints a picture of minor friction between Dynetics and Rolls-Royce on scheduling issues, but neither party believed this friction was serious enough to trigger termination of the contract. Team Dynetics' success in winning the Prime Contract for Option 3 and Dynetics continued relationship with Rolls-Royce through September 2019 indicate these minor squabbles—like the fuss over the small budget adjustment in May 2019—are a pretext to allow Dynetics to terminate exclusivity and enlist the services of a different subcontractor. Rolls-Royce's evidence is sufficient to support a successful breach of contract claim based on the Teaming Agreement's exclusivity clause. Rolls-Royce has a high likelihood of success on the merits.

### 2.      **Irreparable Harm**

Rolls-Royce identifies three irreparable harms it will suffer if an injunction does not issue to maintain the status quo through the arbitration process. First, it contends that the HEL-TVD is a first-of-its-kind technology, and the advantage of being first to market with this product cannot be remedied by any arbitral award. (Filing No. 61 at 29.) Second, Rolls-Royce will suffer reputational harm if Dynetics is allowed to terminate exclusivity. *Id.* at 29-30. And third, if Dynetics shares Rolls-Royce's proprietary information with its competitors, Rolls-Royce would

be deprived of the benefit of years of time that it spent to develop that information. *Id.* at 30. None of these harms are compensable by monetary damages, according to Rolls-Royce.

Dynetics responds that the normal remedy for breach of contract is monetary damages. (Filing No. 57 at 44.) The Seventh Circuit has identified four scenarios where monetary damages might be inadequate: (a) where the damages award would come too late to save the plaintiff's business; (2) where the plaintiff may not be able to finance the lawsuit without the revenues the defendant's conduct is placing at risk; (3) where a defendant is at risk of becoming insolvent before a final judgment; and (4) where monetary damages are difficult to calculate due to the nature of the plaintiff's loss. *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984). Rolls-Royce seeks injunctive relief arguing that monetary damages are inadequate. In contrast, Dynetics argues there is nothing to suggest any of these scenarios is present here. Dynetics also argues that contracts where proprietary information will change hands often have injunctive relief clauses. Because the Teaming Agreement has no such clause, Dynetics urges the Court to infer that Rolls-Royce agreed that monetary damages would be a sufficient remedy when it signed the Teaming Agreement. (Filing No. 57 at 45.)

Alabama law holds "that a preliminary injunction should be issued only when the party seeking the injunction can demonstrate that, without the injunction, he or she would suffer irreparable injury for which there is no adequate remedy at law." *Ex parte B2K Systems, LLC*, 162 So.3d 896, 904 (Ala. 2014). "Irreparable injury is an injury that is not redressable in a court of law through an award of money damages." *Id.* (internal quotations and citations omitted). The injury must be imminent; a mere threat of irreparable injury will not suffice. *Id.* "The party seeking the injunction has the burden of demonstrating that it lacks an adequate remedy." *Id.*

The Teaming Agreement also contains a mutual limitation of liability clause that states as follows:

> 10.9   Limitation of Liability.  IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR CONSEQUENTIAL, INCIDENTAL OR PUNITIVE LOSS, DAMAGES OR EXPENSES (INCLUDING LOST PROFITS OR SAVINGS) EVEN IF ADVISED OF THEIR POSSIBLE EXISTENCE.

(Filing No. 57-1 at 8) (emphasis in original).  Dynetics argues that this clause prohibits equitable relief for either party.  Rolls-Royce responds that Dynetics has offered no precedential authority to support its interpretation of the limitation-of-liability clause.  Rolls-Royce relies on *McRoberts Software, Inc. v. Media 100 Inc*., 2001 WL 1224727 (S.D. Ind. Aug. 17, 2001) and *Terminex Intern. Co., LP v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327 (11th Cir. 2005), to establish that injunctive relief is still allowed, even in contracts with a limitation-of-liabilitiy damage clauses, unless a party has expressly waived the right to equitable relief.   In other words, Rolls-Royce asserts that here, because the Limitation of Liability provision does not specifically "say anything by way or precluding equitable relief" the Court may provide equitable relief damages if they can meet the four requirements for a preliminary injunction.  *See McRoberts* at 15. The Court is persuaded by Rolls-Royce's argument and will proceed with its analysis despite the limitation-of liability-clause.

With respect to Rolls-Royce's loss of the first-to-market advantage, he Court is not convinced that it could not be remedied by monetary damages. LibertyWorks CEO provided on speculative evidence of first to market damages. [6]

---

[6] When asked at his deposition what the value of being first to market is, Mark Wilson, CEO of LibertyWorks replied:

> Extremely important. As I mentioned, you know, when you are on a program like this, you get to develop the system, you get to test the system, you get exposure to the customer, eventually your position for a program of record, that would then lead toward qualification, fielding. And so you would be in the position of having that capability through the full system on a playform that then is

With respect to Rolls-Royce's loss of goodwill and reputation, LibertyWorks argues these damages would be difficult to quantify. LibertyWorks invested a decade of effort and millions of dollar in development of the HEL-TVD technology. At the hearing, LibertyWorks argued it would lose its ability to say, "we were a partner in the successful launch of this weapon" and the loss of client confidence and customer goodwill in this market could not be measured in monetary damage. (*See* Filing No. 67 at 31.) Although the Court is convinced that damages for loss of goodwill and reputation would be hard to quantify, Rolls-Royce has not presented evidence that danger of reputational damage is actual or imminent. It simply argues that if Dynetics were to terminate exclusivity and enlist another subcontractor, "negative impact on LibertyWorks's reputation and loss of customer goodwill…would inevitably follow." (Filing No. 12 at 23.) If reputational damage were an inevitable result of termination, Rolls-Royce should have designated evidence supporting that supposition. This speculative injury, though perhaps likely, cannot support the issuance of an injunction without some evidence to support the suggestion that is actual and imminent.

However, a disclosure of Rolls-Royce's confidential information and trade secrets to its direct competitors, which evidence shows Dynetics was planning in April 2019 when it scrubbed Rolls-Royce's documents of their watermark, would certainly constitute irreparable harm. As the Alabama Supreme Court has said, "[p]rotectible interests certainly include, but are not limited to … valuable customer relationships and goodwill … and confidential information, such as trade secrets and confidential business practices." *Ormco Corp. v. Johns*, 869 So.2d 1109, 1119 (Ala.

---

fielded. And so that's extremely valuable. One of the reasons we were very interested in teaming and finding the right partners to team with to go win the program.

(Filing No. 61-40 at 54.) He went on to say that the first to market advantage would allow Rolls-Royce to operating a "defense business unit" that would boost company profits just like "[a]ny production program does in the end." *Id.* at 54-55.

2003).  In oral argument, Rolls-Royce argued the evidence shows Dynetics "has our intellectual property sitting in an RFP ready to go to their competitors, that was purportedly sanitized and scrubbed" for that reason.  (Filing No. 67 at 35.)

This potential harm rises above the level of "mere possibility," which is insufficient to constitute irreparable injury under Alabama law. *Ormco* at 1113-14. It rises to the level of imminence because the evidence shows that, more than mere threats to release Rolls-Royce's confidential information to its competitors, Dynetics took active steps in preparation of releasing the information by sanitizing documents. (Filing No. 61-6; Filing No. 61-10 at 3; Filing No. 61-30; Filing No. 61-31.)  Dynetics' corporate designee admitted that the purpose of removing LibertyWorks' name and insignia from the documents was possibly to send them "to another vendor who might be able to do the same scope of work" as LibertyWorks. (Filing No. 61-39 at 88.) Confidential information and trade secrets are protectible interests under Alabama law, and an injunction can properly issue when their exposure is imminent. *Ormco* at 1119. Here, the threat of their exposure is imminent, rather than speculative, because Dynetics took active steps to publish Rolls-Royce's confidential information to its competitors.

If Dynetics were to terminate exclusivity and bring on another subcontractor, and especially if it were to provide that subcontractor with Rolls-Royce's confidential information, damages would be difficult if not impossible to quantify, should Rolls-Royce ultimately succeed on its breach of contract claim. Nevertheless, the Court is left with the question of whether this specific irreparable injury—exposure of its confidential information—requires an injunction as broad in scope as the one Rolls-Royce requests. Rolls-Royce asks the Court to enjoin Dynetics from (1) terminating the Teaming Agreement, (2) treating the exclusivity provision of the Teaming Agreement as of no effect, (3) negotiating with any other entities regarding the work to be

exclusively performed by LibertyWorks under the Teaming Agreement, and (4) sharing any of LibertyWorks' confidential and/or proprietary trade secrets with any other entities. ([Filing No. 11](.).) The Court believes the the imminent irreparable harm Rolls-Royce will suffer could be stopped by granting just the last request.

For the reasons stated herein, the Court concludes that Rolls-Royce has carried its burden to show that an arbitral award would not restore it to the status quo ante if it succeeds on its breach of contract claim. As the Court discussed in Section III.A. of this Order, this finding also establishes the Court's jurisdiction to issue a preliminary injunction in this case.

### 3.  <u>Balance of Harms and Public Interest</u>

Because Rolls-Royce has established the above threshold requirements, "the court must weigh the harm that the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction, and consider whether an injunction is in the public interest." *Planned Parenthood of Ind. And Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 896 F.3d 809, 816 (7th Cir. 2018). "The Seventh Circuit employs a sliding scale approach for this balancing: if a plaintiff is more likely to win, the balance of harms can weigh less heavily in its favor, but the less likely a plaintiff is to win the more that balance would need to weigh in its favor. *Jackson v. Wexford of Ind., LLC*, 2019 WL 5566442 at *2 (S.D. Ind. Oct. 29, 2019) (internal quotations omitted).

Rolls-Royce has a significant likelihood of success on the merits. Likewise, the balance of harms weighs in Rolls-Royce's favor. It stands to lose goodwill, a potential first-to-market advantage, and it risks exposure of its confidential information if Dynetics is allowed to jettison it to another subcontractor. Dynetics contends that an injunction will force it "to allow [Rolls-Royce] to continue to fail to meet budget, technical, and pricing requirements." ([Filing No. 57 at 52](.).) The

Court views the technical issues as minor, and any budget overruns are easily calculable. The balance of harms weighs in Rolls-Royce's favor.

Additionally, issuing an injunction would not disserve the public interest. The consequence would be to allow the same team that won the Army Option 3 contract to continue moving forward on the HEL-TVD project. Dynetics believes the true victims of an injunction would be the Army and the United States government because an injunction would "delay the schedule to complete the prime contract." *Id.* at 53. But Rolls-Royce stands ready to work with Dynetics through the arbitration process and keep the project on schedule. An injunction in this case would not harm the public interest.

Accordingly, the Court **grants in part** Rolls-Royce's Motion for Preliminary Injunction and Temporary Restraining Order (Filing No. 11). Pending completion of the arbitration process, Dynetics is enjoined from sharing any of Rolls-Royce's and LibertyWorks's confidential and/or proprietary trade secrets with any other entities in violation of the non-disclosure agreement.

**J.**     **Bond**

"The purpose of an injunction bond is to compensate the defendant, in the event he prevails on the merits, for the harm that an injunction entered before the final decision caused him." *Ty, Inc. v. Publ'ns Int'l Ltd.*, 292 F.3d 512, 516 (7th Cir. 2002). Dynetics faces minimal risk of missing any deadlines or incurring any damages. On November 22, 2019, Dynetics issued LibertyWorks a Stop Work Order, directing all work on Option 3 to stop. (Filing No. 61-38.) Therefore, there will be no further charges by LibertyWorks to Dynetics unless Dynetics lifts the Stop Work Order. A bond in the amount of $100,000.00 will more than adequately cover any potential damages that might arise if the preliminary injunction is wrongfully issued.

## II.     CONCLUSION

Rolls-Royce has demonstrated it is likely to succeed on the merits of its breach of contract claim—that Dynetics improperly terminated the Teaming Agreement.  The evidence in the record shows that Dynetics plotted to oust Rolls-Royce as its subcontractor and, in doing so, violated the exclusivity provision of the Teaming Agreement.  Some of Rolls-Royce's damages, should it succeed on its breach of contract claim, would be difficult if not impossible to quantify.  And the harm to Rolls-Royce outweighs any potential harm to Dynetics.  Considering these factors, it is clear that equity demands a preliminary injunction.

Accordingly, Rolls-Royce's Motion for Preliminary Injunction and Temporary Restraining Order is **GRANTED IN PART AND DENIED IN PART**.  Pursuant to Federal Rule of Civil Procedure 65(d), the Court **issues a preliminary injunction** prohibiting Dynetics, through the completion of the arbitration process, from sharing any of Rolls-Royce's and LibertyWorks's confidential and/or proprietary trade secrets with any other entities in violation of the non-disclosure agreement.  Rolls-Royce shall post a bond in the amount of $100,000.00.

   **SO ORDERED.**

Date:  1/28/2020

_____
TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Aron J. Beezley
BRADLEY ARANT BOULT CUMMINGS LLP
abeezley@bradley.com

Sean Thomas Devenney
DREWRY SIMMONS VORNEHM, LLP (Carmel)
sdevenney@dsvlaw.com

Christopher Steven Drewry
DREWRY SIMMONS VORNEHM, LLP (Carmel)
cdrewry@dsvlaw.com

Samuel B. Gardner
ICE MILLER LLP (Indianapolis)
samuel.gardner@icemiller.com

Brett Ingerman
DLA PIPER LLP
brett.ingerman@us.dlapiper.com

Andrew J. Miroff
ICE MILLER LLP (Indianapolis)
drew.miroff@icemiller.com

Sarah Sutton Osborne
BRADLEY ARANT BOULT CUMMINGS LLP
sosborne@bradley.com

Dawn Elyse Stern
DLA PIPER LLP
dawn.stern@dlapiper.com

Robert J. Symon
BRADLEY ARANT BOULT CUMMINGS LLP
rsymon@bradley.com